## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WILLIAM METZGER and IBB, LLC,

*Plaintiffs,*

vs.

Case No. 2:22-cv-02043-EFM

IDLE SMART, INC.,

*Defendant.*

## MEMORANDUM AND ORDER

Before the Court is Defendant Idle Smart, Inc. ("Idle Smart")'s Motion for Partial Summary Judgment (Doc. 78) on Count IV of Plaintiff's Second Amended Complaint (Doc. 31) and Count I of Defendant's Counterclaim (Doc. 35), both of which are claims for declaratory judgment as to the parties' rights and obligations under their licensing contract. Defendant also seeks summary judgment on Count III of Plaintiffs William Metzger and IBB, LLC's Second Amended Complaint, which asserts a claim for breach of the covenant of good faith and fair dealing. The Court denies Defendant's Motion as to Plaintiff's Count IV and Defendant's Count I because the contractual language is ambiguous. As to Plaintiff's Count III, the Court grants in part and denies in part Defendant's Motion.

## I.       Factual and Procedural Background[1]

### A.       Background facts

William Metzger is an inventor, professor, and the patent holder for U.S. Patent No. 7,027,912 (the "912 Patent"). The 912 Patent describes a "Method and System for Controlling an Engine to Maintain a Comfortable Cabin Temperature Within a Vehicle." Specifically, the 912 Patent gains its uniqueness from using both a cabin interior temperature sensor and an ambient (or outside) temperature sensor.[2] This is because similar technologies incorporating only an interior temperature sensor were already known in the trucking industry. The 912 Patent's technology allows the engine to automatically turn on whenever the interior and ambient temperatures fall into a predetermined guideline range.

### B.       Facts underlying Count IV

On July 25, 2012, Metzger executed two integrally related contracts pertaining to the Patent. First, the Asset Purchase Agreement ("APA") transferred a list of assets to directly to Defendant. In contrast, the License and Assignment Agreement ("LAA") provides to Defendant "an exclusive license under the Patent to develop, have developed, make, have made, use, market, sell, offer for sale, have sold and distribute the Product in the Territory." The LAA includes a conflicting provisions term, which provides that in the event of conflict between the APA and the LAA, the LAA's terms will control. The relation of these contracts to each other, and the entwined definitional roadmaps, forms a large part of the controversy between the parties.

---

[1] The facts are those uncontroverted by the parties.

[2] In contesting Defendant's statement of facts, Plaintiffs argue that the Patent does not require the use of an ambient temperature sensor. Given that interpretation of the Patent is unnecessary in deciding Defendant's Motion, the Court declines to address the issue. It does, however, note that each of the Patent's claims explicitly mention temperature sensors for determining ambient temperatures.

The APA purported to convey, among other assets, the original Idle Smart Unit, "Seller Technology," "Seller Confidential Information," "Seller Know-How," and "Seller Improvements."  It also stated that Metzger would transfer to Defendant "one hundred percent (100%) of the Acquired Assets other than the Patent, the Patent Rights, and the Base Software which will be transferred to Idle Smart as set forth in the Patent License."  In contrast, the LAA purported to *license* the "Technology," "Metzger Know-How," and "Metzger Improvements," each of which relies on nearly identical definitions as their counterparts in the APA.  The LAA also licenses the "Product," initially defined as "any product which contains the Technology in whole or in part."

Specifically, the Agreements share the following definitions:[3]

a.      "Confidential Information," defined as "Seller Know-How, all technical and scientific know-how and information, trial results, computer programs, knowledge, technology, means, schematics, systems, methods, processes, practices, formulas, techniques, procedures, designs, drawings, apparatus, written and oral representations of data, specifications, and all other scientific, regulatory, marketing, financial and commercial information or data, whether communicated in writing, verbally or electronically."

b.      "Know-How," defined as "all proprietary, nonpublic information, including, without limitations, processes, techniques, formulas, formulations and formulation technology, data, methods (including but not limited to analytical methods), equipment designs, know-how, show-how and trade secrets, patentable or otherwise, tangible or intangible, that are owned or Controlled by Seller or his Affiliate."

c.      "Improvements," defined as "any enhancement of Page 4 of 17 or improvement to the formulation, constituents, intermediates, preparation…or any new or expanded indication(s) specifically relating to the Product developed, invented or acquired by, or coming under the Control of Seller or his Affiliate."

---

[3] Where the definitions in the Agreements are not identical, the parties maintain—and the Court agrees—that the definitions are substantially similar, evidencing an intent to refer to the same thing.  However, the APA and LAA used "Seller" and "Metzger" respectively to refer to the confidential information, know-how, improvements, and technology.  Given that these labels undisputedly refer to the same person, the Court does not distinguish between them.

d.      "Patent" as "[T]he United States Patent 7,027,912 issued to Metzger on April 11, 2006, and any and all additions, all divisions, continuations, continuation-in-part, reissues, reexaminations, substitutions, extensions, patent term extensions and renewal of the Patent, and patents issued therefrom, including, but not limited to, (i) the Metzger Know-How, the Metzger Improvements, any and all other trade secrets, discoveries, concepts, ideas, technologies, whether patentable or not, including processes, methods, formulas and techniques related to the foregoing, any and all written, unpatented technical or scientific information developed or acquired by Metzger or his Affiliate, including laboratory and clinical notebooks, prototypes, samples, research data, research memoranda, computer software (including source code), computer records, scientist's notes, consultant reports, research reports from a Third Party, abandoned patent applications, invention disclosures, patentability reports and searches, patent and literature references, and the like developed or acquired related to such patents and patent applications; (ii) any and all copyrights, copyright registrations and copyrightable subject matter owned or controlled by Metzger or his Affiliate related to such patents and patent applications; and (iii) any trademarks related to such patents or patent applications."

Finally, the APA and LAA contain slightly different definitions of "Technology."  The APA defines Technology as "technology related to the method and system for controlling an engine to maintain a comfortable cabin temperature as of the Closing Date, except that it does not include Base Software as defined herein."   In contrast, the LAA defines Technology as "technology related to the method and system for controlling an engine to maintain a comfortable cabin temperature as provided in the Patent."

"In consideration of the rights and licenses granted" in the Patent License, Idle Smart agreed to "pay royalty payments to Metzger . . . up to an aggregate amount of $3,000,000, for: (1) the sale of the Product; (2) the use the Product; (3) the making of the Product; or (4) sublicensing the right to sell, use or make the Product."  The LAA did not include a minimum amount of royalties to which Metzger was entitled.

Since the parties entered into the Agreements, they have amended it four times.  Relevant to this case, the Fourth Amendment—entered into on January 1, 2019—changed both the royalty

-4-

payment structure and the definition of "Product."  As the current representation of the parties' Agreements, it provides that " 'Product' means any product which contains the Technology, in whole or in part, and any other product developed during the course of the Agreement that relies upon the Technology as set forth in the Patent, directly or indirectly, in the design, creation, manufacture, and/or use thereof."  It also changed the royalty payment structure to the following:

| Product Sold | Royalty Calculation |
|---|---|
| Idle Smart Units (including all battery only units) | 25% of the Sale Price for each Unit |
| MedPro Units | 12% of the Sale Price for each Unit |
| Idle Free Units | 12% of the Sale Price for each Unit |

The Fourth Amendment also defined "Idle Smart Units" as "those Products which contain the Technology as originally [] licensed and assigned in the Agreement."   It further defined "MedPro Units" and "Idle Free Units" as "those Products which contain the Technology as provided in the Patent and as further developed by Idle Smart."  These product names also refer to actual products currently offered by Defendant, although the current iteration of the original Idle Smart Unit is now called the "Cabin Comfort Unit."  The MedPro Unit manages cabin comfort for ambulance drivers and consists of the substantially the same components as the Cabin Comfort Module: underdash controller, hood switch, internal temperature sensor, ambient temperature sensor, a kill switch, and ignition control board.  In contrast, Idle Free Units do not rely on ambient or interior temperature sensors—rather, the purpose of the Idle Free Units is to monitor the truck engine's battery life and prevent it from failing.  Each of these other products is almost always sold together with the Cabin Comfort Unit.

c.      **Facts and allegations underlying Count III**

As originally filed, Plaintiffs' Count III—which states a breach of contract claim based on breach of implied duty of good faith and fair dealing—alleged six factual bases for this claim. After Defendant's partially successful motion to dismiss Count III, only two bases remain:

> (1) Defendant did not develop, maintain, and provide sufficient royalty statements to adequately apprise Metzger of his rights and amounts of royalty payments due to Metzger and IBB.

> (2) Defendant did not cooperate in the audit process afforded Metzger under the terms of the Agreement.

Plaintiffs base their argument regarding Defendant's failure to provide royalty statements on the following language from the LAA about Metzger's audit rights:

> 5.6 Records; Audit Rights. Idle Smart shall keep full, true and accurate books of account containing all particulars that may be necessary for the purpose of showing the amounts payable to Metzger hereunder. Such books of account shall be kept at Idle Smart's principal place of business. Such books and the supporting data shall be retained for three (3) years following the end of the calendar year to which they pertain, and, upon reasonable advance written notice to Idle Smart, open to the inspection of Metzger or its agents for the sole purpose of verifying *Idle Smart's royalty statement*[4] or compliance in other respects with this Agreement and not prior to the sale of the first 24 units of the Products.

Plaintiffs interpret this section as requiring Defendant to provide a royalty statement with each royalty payment. They allege that Defendant never provided 2020 Fourth Quarter royalty statement which would have allowed Plaintiffs to verify the 2020 Fourth Quarter royalty payment. Furthermore, when Metzger received a wire transfer for the 1st Quarter 2021 royalty payment, no royalty statement accompanied it. Then, when Metzger requested the 1st quarter 2021 royalty statement, Lynch responded that the statement would not be provided. Metzger continued to

---

[4] Emphasis added.

receive wire transfers for royalty payments for the 2nd, 3rd, and 4th quarters of 2021 without accompanying royalty statements.

Finally, in support of the allegation that Defendant did not cooperate in the audit process, Plaintiffs allege Defendant failed to provide the documents necessary to account for the royalty payments. After Defendant failed to make on-time royalty payments, Metzger decided to request an audit of Defendant's records, as permitted by section 5.6 of the LAA. Although the Agreements authorized only an audit in person at Defendant's headquarters, Defendant agreed to allow the audit to proceed remotely. From September 2020 to November 2020, Defendant provided records to Metzger's chosen auditing firm. The only resistance from Defendant happened in January 2021 when the auditor requested Defendant's bank statements. Defendant communicated that it would be willing to send Metzger the bank statements with confidential information redacted.

Sometime later, Defendant informed Metzger that—according to information discovered during the audit process—it had overpaid royalties to Metzger. Metzger immediately canceled the audit process altogether.

Prior to Metzger canceling the audit, Defendant claims that it had "agreed to everything Plaintiffs demanded." Plaintiffs controvert this statement, claiming that "Mr. Metzger expressly states in his cited deposition testimony that Idle Smart had not produced documents for the audit as requested by Plaintiffs." Plaintiffs cite Exhibit A, p. 317:18–24, which reads:

> Q.      Isn't it true, sir, that part of your lawsuit you claim that Idle Smart breached the contract by not agreeing to an audit?
>
> A.      I think there was some documents that came about after this with Jeff's revelation of the overpayment was one of the reasons I stopped it.

## II.        Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[7]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[8]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[9]  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[10]  Nevertheless, "[a] mere scintilla of evidence supporting the nonmovant's position will not create a genuine issue of material fact; the fact issue must make it so that a reasonable jury could find for the nonmovant."[11]

---

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[10] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[11] *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 921 (10th Cir. 2022).

### III.    Analysis

"Contract interpretation is a question of law."[12]  Under Kansas law, "[t]he primary rule for interpreting written contracts is to ascertain the parties' intent."[13]  When contract terms are clear, courts must determine the parties' intent from just the contract's language instead of utilizing rules of construction or considering extrinsic evidence.[14]  In contrast, extrinsic or parol evidence may be used to construe ambiguous language in a contract.[15]  Kansas law "favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided."[16]  Nevertheless, "[t]he question of whether the language in a written contract is ambiguous is one of law for the court."[17]  Whether the parties themselves believe there is any ambiguity is immaterial.[18]  In the context of summary judgment, ambiguity becomes very important—the court may only grant summary judgment on a claim involving contract interpretation when there are unambiguous terms or ambiguous terms with no genuine dispute of material fact as to extrinsic evidence which clarifies those terms.[19]

In construing a contract, and determining whether contractual language is ambiguous, courts applying Kansas law must consider the contract in its entirety, i.e., "from its four corners."[20]

---

[12] *See Johnson v. Heath*, 56 F.4th 851, 863 (10th Cir. 2022) (further citation and quotations omitted); *see also Waste Connections of Kan., Inc. v. Ritchie Corp.*, 296 Kan. 943, 298 P.3d 250, 264 (2013).

[13] *Waste Connections*, 298 P.3d at 264 (quoting *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011)).

[14] *Id.*

[15] *See id.*

[16] *Id.* at 265 (further citations and quotations omitted).

[17] *Id.*

[18] *See id.*

[19] *See id,* at 264 (citing *Wulf v. Shultz*, 211 Kan. 724, 508 P.2d 896, 902 (1973)).

[20] *Id.* (further citations and quotations omitted).

Similarly, "[w]here two or more instruments are executed by the same parties at or near the same time in the course of the same transaction and concern the same subject matter, they will be read and construed together to determine the intent of the parties."[21]

**A.     Due to ambiguous contractual language, the Court cannot determine on summary judgment which of Defendant's offered products are subject to royalties.**

Both parties in their respective claims ask this Court to enter declaratory judgment as to the royalties due from Defendant to Plaintiffs under the Agreements.  This necessitates examining the contractual language to determine the parties' intent.  Here, the APA and LAA were entered into on the same date by the same parties.  By their very terms, they relate to and rely on each other, evidencing the parties' clear intent that they be read and construed together.  However, as the parties rightly point out, the APA and LAA are in conflict because the APA purports to sell outright what the LAA merely licenses to Idle Smart—that is, the Seller/Metzger Technology, Confidential Information, Know-How, and Improvements.  This conflict, however, is not relevant to which products royalties are owed on.

A contract is a simple thing—one part offer, one part acceptance, and one part consideration.[22]  There is no requirement in either Kansas law or in the Agreements that consideration may only take the form of royalties paid for *licensed* products.  Rather, it is wholly conceivable, if perhaps unusual, that royalties could be paid on products for which Defendant owns the IP outright as consideration for the continued license.  Therefore, it is irrelevant whether the

---

[21] *City of Arkansas City v. Anderson*, 242 Kan. 875, 752 P.2d 673, 679 (1988) (quoting *Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169, 170 (1984)).

[22] *Howard v. Ferrellgas Partners, L.P.*, 92 F. Supp. 3d 1115, 1124 (D. Kan. 2015) (further citation omitted).

Technology and other assets as defined by the Agreements were licensed or assigned to Defendant. Accordingly, the Court declines to decide this issue.

However, the Agreements taken together are ambiguous regarding for which products Defendant must pay royalties to Metzger.   Under the Fourth Amendment—the most recent statement of the parties' intent—Defendant owes royalties on Idle Smart Units, MedPro Units, and Idle Free Units.  The uncontroverted evidence establishes that Defendant offers specific products bearing those names, with the exception that the Idle Smart Unit is now called the Cabin Comfort Unit.

The Fourth Amendment, however, does not employ such a straightforward definition. Rather, it defines the named products as those which "contain the Technology as provided in the Patent."  In both the APA and the LAA, the "Patent" definition refers not only to the contents of the 912 Patent itself but also "Metzger Know-How, the Metzger Improvements, any and all other trade secrets, discoveries, concepts, ideas, technologies, whether patentable or not, including processes, methods, formulas and techniques," etc. that are "related to" the 912 Patent.

The term "related to" is fraught with ambiguity.  Nothing in the Agreements defines "related to" or provides context to what it might mean for something to be "related to" the 912 Patent.  Therefore, the Court must examine the uncontroverted extrinsic evidence in this case to determine the parties' intended meaning of "related to."

Unfortunately, neither party presents any extrinsic evidence of what "related to" the 912 Patent means in this context.  Conceivably, each of the named products relate to the 912 Patent as they utilize similar components and technology, interact with the original or modified Cabin Comfort Unit, are mere variations on the original model, or are typically sold with the Cabin Comfort Unit.  The very fact that the contract language facially broadens the definition of "Patent"

-11-

beyond just the 912 Patent itself supports finding that products need not utilize the 912 Patent's technology to be "related to" it..  Nevertheless, there are no parameters within the contract nor extrinsic evidence of the parties' intent to define what does relate to the 912 Patent and what does not.

Without knowing what the parties mean by "related to," it is impossible to determine whether the MedPro Units and Idle Frees Units—or even Defendant's other products—are in fact related to the 912 Patent.  Accordingly, it is impossible to ascertain the parties' intent for which products Defendant was to pay royalties to Metzger.  Therefore, summary judgment is denied as to Plaintiffs' Count IV and Defendant's Count I.

## B.     Defendant's Motion for Summary Judgment as to Count III is granted in part and denied in part.

Before reaching the pertinent arguments, the Court must address two tissues.  First, Plaintiffs do not respond substantively to Defendant's Motion regarding this count.  Plaintiffs make general arguments about "thrust of the parties' [LAA]" and Defendant's overall intent in frustrating royalty payments.  These allegations, however, are wholly inadequate to properly oppose Defendant's Motion on this Claim.

Nevertheless, the Court cannot grant a motion for summary judgment simply because it is unopposed.[23]  Instead, Defendant must still "must meet its 'initial responsibility" of demonstrating that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law."[24]

---

[23] *See Petitt v. Campbell*, 2018 WL 5084317, at *4 (D. Kan. 2018) (further citations omitted).

[24] *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also* Fed. R. Civ. Proc. 56(e)("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (3) grant summary

Second, Defendant argues briefly in its Reply that a claim for violation of the covenant of good faith and fair dealing is unavailable under Kansas law.  The main case they cite in support of this position clearly states that the "*tort* for breach of the implied covenant of good faith" is unavailable in a commercial context.[25]  Thus, Defendant's argument is a misstatement of the law, or a misunderstanding of the facts.  Kansas law is clear that a claim for breach of the implied duty of good faith and fair dealing is cognizable under a breach of contract claim—which is precisely what Plaintiffs have pled all along.  Regardless, "the court does not consider arguments raised for the first time in a reply brief."[26]

As stated above, the Court recently dismissed four of the six alleged bases for Plaintiff's claim for breach of the covenant of good faith and fair dealing.  Two remain: (1) failure to provide royalty statements and (2) failure to cooperate in the audit process.  The Court will first summarize the law governing Count III and then address each of the remaining bases in turn.

1.    *Kansas law regarding covenant of good faith and fair dealing*

Under Kansas law, there is:

[A]n implied undertaking in every contract on the part of each party that he will not intentionally and purposefully do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of another party to receive the fruits of the contract.[27]

---

judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it.").

[25] *See Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1052 (D. Kan. 1990) (emphasis added); *see also Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 652 P.2d 665, 668 (1982) (cited by *Ritchie Enterprises* and holding that tort of bad faith was unavailable under Kansas law).

[26] *H&C Animal Health, LLC v. Ceva Animal Health, LLC*, 499 F. Supp. 3d 920, 935 (D. Kan. 2020).

[27] *Waste Connections*, 298 P.3d at 266 (further citations and quotations omitted).

This "implied undertaking" is known as the covenant of good faith and fair dealing.[28]  In essence, "the law implies a counter promise against arbitrary or unreasonable conduct on the part of the promisee."[29]  The implied covenant of good faith and fair dealing becomes relevant when, "the parties to the contract realize detailed provisions on performance would be ineffectual, frustrating, or impractical."[30]  In practice, the covenant forces parties to perform consistent with their intentions and expectations that are expressly or impliedly included in the terms of the agreement.[31]

However, "essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing."[32]  This is because "the purpose of requiring good faith and fair dealing in contracts is to protect the reasonable expectations of the parties—not to rewrite contracts."[33]

Accordingly, to state a claim for breach of the covenant of good faith and fair dealing under Kansas law, the plaintiff must "(1) plead a cause of action for breach of contract, not a separate cause of action for breach of duty of good faith, and (2) point to a term of the contract which the defendant allegedly violated by failing to abide by the good faith spirit of that term."[34]

---

[28] *See id.*

[29] *Id.* (further citations and quotations omitted).

[30] *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1178 (D. Kan. 1990).

[31] *Id.* at 1179.

[32] *Id.* (further citations and quotations omitted).

[33] *Pizza Hut, Inc. v. Koch Indus.*, 2001 WL 37132182, *8 (Kan. Ct. App. 2001) (citing *Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152, 1155 (10th Cir. 1994)).

[34] *Terra Venture, Inc. v. JDN Real Estate-Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006) (quoting *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1359 (D. Kan. 1996)); *see also Steven Volkswagen, Inc. v. Zurich Am. Ins. Co.*, 2020 WL 2615764, at *7 (D. Kan. 2020) ("Breach of the implied covenant of good faith and fair dealing is not a separate claim, but rather a 'legal argument related to a breach-of-contract claim.' ") (quoting *Classico, LLC v. United Fire and Cas. Co.*, 386 P.3d 529, 2016 WL 7324451, at *5 (Kan. Ct. App. 2016)).

Whether a party violated the covenant of good faith and fair dealing is usually a question of fact best left to the factfinder.[35]  However, when the underlying facts are undisputed, the court may determine on summary judgment whether the implied covenant of good faith and fair dealing has been violated.[36]

> 2.      *Defendant fails to show it is entitled to summary judgment on the basis of not providing royalty statements as to Count III.*

The first remaining basis for Plaintiffs' breach of the covenant of good faith and fair dealing claim, Count III, stems from Defendant's alleged failure to provide royalty statements to Plaintiffs. In its order denying Defendant's motion to dismiss as to this basis, the Court held:

> The context of Section 5.6 of the Agreement indicates that Defendant was required to provide some type of statement to Metzger explaining Defendant's royalty payments.  The term clearly indicates that Metzger would be able to request an audit once a calendar year to inspect Defendant's books of account and verify the royalty statement provided to Metzger.  By not providing Metzger with a royalty statement along with the royalty payments, Metzger was unable to determine if the royalty payments Defendant made were proper.  Furthermore, without a royalty statement, there would not be any documentation for Metzger to verify during an audit process.  In other words, without a royalty statement accompanying the payments, the provision authorizing Metzger to request audits would become meaningless.

The same reasoning holds true for Defendant's present Motion.  Furthermore, Defendant has offered no factual statements related to this basis for Plaintiffs' Count III whatsoever. Defendant does not even point to a lack of evidence regarding damages or its own alleged bad faith.  In short, nothing has changed.  Accordingly, Defendant has failed to meet its burden showing that it is entitled to summary judgment.  The Court denies summary judgment as to Count III on this basis.

---

[35] *Waste Connections*, 298 P.3d at 265.

[36] *See First Nat. Bank of Omaha v. Centennial Park, LLC*, 48 Kan. App. 2d 714, 303 P.3d 705, 716 (2013).

*3.      Defendant is entitled to summary judgment on Plaintiffs' claim that they did not cooperate in the audit process.*

In contrast, summary judgment for the second basis for Count III—failure to cooperate in the audit process—is appropriate at this stage.  First, it is uncontroverted that Defendant cooperated with Plaintiffs' audit request by allowing it to be conducted remotely contrary to the LAA's terms and delivering bank records despite believing they were unnecessary.  Furthermore, Plaintiffs stopped the audit process—not Defendant—immediately after Defendant informed them that it had overpaid royalties.  The sole issue of contention is whether "Idle Smart agreed to everything Plaintiffs demanded."

In attempting to controvert that declaration of fact, Plaintiffs state that "Mr. Metzger expressly states in his cited deposition testimony that Idle Smart had not produced documents for the audit as requested by Plaintiffs."  Plaintiffs cite Exhibit A, p. 317:18–24 to support this contention.  In its entirety, the cited portion of Metzger's deposition reads:

> Q.      Isn't it true, sir, that part of your lawsuit you claim that Idle Smart breached the contract by not agreeing to an audit?
>
> A.       I think there was some documents that came about after this with Jeff's revelation of the overpayment was one of the reasons I stopped it.

To claim that Metzger's vague, speculative testimony "expressly states . . . that Idle Smart had not produced documents for the audit as requested by Plaintiffs" borders on a material misrepresentation to this Court.  At best, this deposition testimony provides a mere scintilla of evidence in support of Plaintiffs' claim—not enough to avoid summary judgment.  Under the evidenced facts, no reasonable jury could find that Defendant breached the covenant of good faith and fair dealing by failing to cooperate in the audit process.  Therefore, the Court grants Defendant summary judgment on this basis for Count III.

-16-

**IT IS THEREFORE ORDERED** that Defendant's Partial Motion for Summary Judgment (Doc. 78) is **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

Dated this 27th day of June, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE